UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X
                                           :
NATIONAL CREDIT UNION ADMINISTRATION       :
BOARD, as Liquidating Agent of             :
Southwest Corporate Federal Credit         :    13 Civ. 6721 (DLC)
Union and Members United Corporate         :
Federal Credit Union,                      :    OPINION & ORDER
                                           :
                        Plaintiff,         :
                                           :
        -v-                                :
                                           :
GOLDMAN, SACHS & CO., GS MORTGAGE          :
SECURITIES CORP.,                          :
                                           :
                        Defendants.        :
                                           :
-------------------------------------------X

APPEARANCES:

For the Plaintiff:

David Fredrick, Wan J. Kim, Gregory G. Rapawy, and Andrew C.
Shen
Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.
Sumner Square, 1615 M Street, N.W., Suite 400
Washington, DC 20036

David H. Wollmuth, Fredrick R. Kessler, Steven S. Fitzgerald,
and Ryan A. Kane
Wollmuth Maher & Deutsch LLP
500 Fifth Avenue, 12th Floor
New York, NY 10010

George A. Zelcs
Korein Tillery LLC
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601

Stephen M. Tillery, Greg G. Gutzler, Peter H. Rachman, and
Robert L. King
Korein Tillery LLC
505 North Seventh Street, Suite 3600
St. Louis, MO 63101

For the Defendants:

Richard H. Klapper, William B. Monahan, Peter A. Steciuk, and
Sara Hausner-Levine
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10024


DENISE COTE, District Judge:

This is one of nine actions brought by the National Credit
Union Administration Board ("NCUA" or "the Board"), as
liquidating agent of Southwest Corporate Federal Credit Union
("Southwest") and Members United Corporate Federal Credit Union
("Members United") (collectively, the "Credit Unions"), against
various financial institutions involved in the packaging,
marketing, and sale of residential mortgage-backed securities
("RMBS") that the Credit Unions purchased in the period from
2005 to 2007.[1]  NCUA brought this case against Goldman Sachs &
Co. and GS Mortgage Securities Corp. (collectively "Goldman
Sachs") on September 23, 2013.  The complaint asserts claims

---

[1] Nat'l Credit Union Admin. Bd. ("NCUA") v. Morgan Stanley & Co.,
Inc., et al., 13 Civ. 6705 (DLC); NCUA v. Bear Stearns & Co., et
al., 13 Civ. 6707 (DLC); NCUA v. Wachovia Capital Markets, LLC
n/k/a Wells Fargo Secs., LLC, 13 Civ. 6719 (DLC); NCUA v.
Goldman Sachs & Co., et al., 13 Civ. 6721 (DLC); NCUA v. RBS
Secs., Inc., et al., 13 Civ. 6726 (DLC); NCUA v. Barclays
Capital, Inc., 13 Civ. 6727 (DLC); NCUA v. Residential Funding
Secs., LLC n/k/a Ally Secs., LLC, 13 Civ. 6730 (DLC); NCUA v.
UBS Secs., LLC, 13 Civ. 6731 (DLC); and NCUA v. Credit Suisse
Secs. (USA) LLC, et al., 13 Civ. 6736 (DLC).

2

under Sections 11 and 12(a)(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k, *l*(a)(2) (2012); and the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. art. 581, § 33 (2013) ("Texas Blue Sky Law").

On November 13, Goldman Sachs filed a motion to compel arbitration.  For the reasons that follow, the motion is denied.

BACKGROUND

Although NCUA's case against Goldman Sachs concerns three securities purchased in 2006 and 2007, the present motion relates to a contract signed almost fifteen years earlier.  In March 1992, Southwest[2] signed a one-page, dual-column contract with Goldman Sachs, titled "Cash Account Agreement."  The contract does not set forth the exact nature of the relationship between the parties, but it appears -- given the nature of the contract terms included -- to be a broker-dealer relationship between Southwest and Goldman Sachs.  For example, Southwest promised that, if it directed Goldman Sachs to purchase securities on its behalf, it would pay for such securities, would pay interest for any late payments, and could be subject to a lien if it failed to pay in certain circumstances.

---

[2] Southwest was a federally chartered corporate credit union with its offices and principal place of business in Plano, Texas.

Additionally, Southwest promised that, if it directed Goldman Sachs to sell securities that it owned, it would provide such securities before the settlement date.

This contract also included a mandatory arbitration clause. The relevant sections of the contract are as follows:

> 9.   This agreement and its enforcement shall be governed by the laws of the State of New York and its provisions shall cover individually and collectively all accounts which Customer may maintain with you. . . .
>
> 10.   (a) Arbitration is final and binding on the parties.
>
>    (b) The parties are waiving their right to seek remedies in court, including the right to a jury trial.
>
>    (c) Pre-arbitration discovery is generally more limited than and different from court proceedings.
>
>    (d) The arbitrator's award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.
>
>    (e) The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.
>
>    <u>Any controversy between you</u> or any of your affiliates or any of your or their partners, officers, directors or employees on the one hand, <u>and Customer</u> on the other hand, arising out of or relating to this Agreement or the accounts established hereunder, <u>shall be settled by arbitration</u> . . . .

(emphasis added).   The contract bears the signature of Emily

Hollis, who lists her title as Vice President of Funds
Management of Southwest Corporate Federal Credit Union.  The
signature is dated March 11, 1992.

In 2006 and 2007, Southwest purchased from Goldman Sachs
three Certificates for $40 million in RMBS that bore the highest
rating from the major ratings agencies.[3]  Beginning in April
2008, these securities were downgraded due to significant
defaults in the loans that served as collateral to the
securities.  By 2010, the securities' credit ratings had been
downgraded to either the lowest or second lowest level.

On September 24, 2010, the NCUA, an independent executive
agency that oversees and regulates corporate credit unions,
placed Southwest into conservatorship, pursuant to the Federal
Credit Union Act, 12 U.S.C. § 1751.  On October 31, it placed
Southwest into involuntary liquidation.  As conservator and
liquidator of Southwest, NCUA assumed all rights and privileges
of Southwest, including the ability to bring suit for pending
claims.

On September 23, 2013, NCUA filed the present suit against
Goldman Sachs.  Its central allegation is that the offering

---

[3] These Certificates are GSAA Home Equity Trust 2007-3, GSAA Home
Equity Trust 2007-5, and Long Beach Mortgage Loan Trust 2006-7.
Details of the RMBS market are not relevant to the present
motion and are therefore not discussed in this Opinion.

documents Goldman Sachs provided relating to the three securities contained material misstatements or omissions.  In a letter of October 8, Goldman Sachs requested that NCUA submit its claims to arbitration, citing the 1992 Cash Account Agreement contract.  In a letter of October 17, NCUA rejected this request, contending that it was not bound to arbitrate for reasons that will be discussed in detail below.

On November 13, Goldman Sachs filed a motion to compel arbitration, citing the 1992 Cash Account Agreement contract.[4] The motion was fully submitted as of December 16.


DISCUSSION

The Federal Arbitration Act ("FAA") provides that an arbitration clause in a contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA was enacted to counteract "widespread judicial hostility to arbitration agreements" and reflects "a liberal federal policy favoring arbitration."  AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740, 1745 (2011) (citation omitted).  Consistent with this policy, "[a] party to an arbitration agreement seeking to avoid

---

[4] Goldman Sachs has reserved its right to file a motion to dismiss should the Court reject its instant motion.

arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." Harrington v. Atlantic Sounding Co., Inc., 602 F.3d 113, 124 (2d Cir. 2010); see also Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 91-92 (2000).  Under § 4 of the FAA, "a party to an arbitration agreement may petition a United States district court for an order directing that 'arbitration proceed in the manner provided for in such agreement.'"  Stolt-Nielsen S.A.v. AnimalFeeds Int'l Corp., 130 S. Ct. 1758, 1773 (2010) (quoting 9 U.S.C. § 4).

Notwithstanding the liberal policy favoring arbitration, it is a "fundamental principle that arbitration is a matter of contract."  Rent-A-Center, West, Inc. v. Jackson, 130 S. Ct. 2772, 2776 (2010); see Applied Energetics Inc. v. NewOak Capital Mkts., LLC, 645 F.3d 522, 526 (2d Cir. 2011) ("[T]he presumption [in favor of arbitrability] does not apply to disputes concerning whether an agreement to arbitrate has been made.").  Accordingly, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  AT&T Techs., Inc. v. Comm. Workers of Am., 475 U.S. 643, 648 (1986) (citation omitted).  "[W]hether parties have agreed to submit a particular dispute to arbitration is typically an issue for judicial determination."  Granite Rock Co. v. Int'l B'hood of Teamsters, 130 S. Ct. 2847, 2855 (2010) (citation omitted).

By attaching the Cash Account Agreement contract to its motion to compel arbitration, Goldman Sachs has submitted evidence of a facially valid contract between Southwest and Goldman Sachs.  NCUA's primary argument in opposing the motion is that this contract, even if valid, is unenforceable.  To support its argument of unenforceability, NCUA cites three separate statutory provisions of its enabling act.

I. Section 1787(c) Repudiation Authority

NCUA invokes its repudiation power under 12 U.S.C. § 1787(c)(1).  That section reads in pertinent part:

> (c) Provisions relating to contracts entered into before appointment of conservator or liquidating agent
>
> > (1) Authority to repudiate contracts
> >
> > In addition to any other rights a conservator or liquidating agent may have, the conservator or liquidating agent for any insured credit union may disaffirm or repudiate any contract or lease --
> >
> > > (A) to which such credit union is a party;
> > >
> > > (B) the performance of which the conservator or liquidating agent, in the conservator's or liquidating agent's discretion, determines to be burdensome; and
> > >
> > > (C) the disaffirmance or repudiation of which the conservator or liquidating agent determines, in the conservator's or liquidating agent's discretion, will promote the orderly administration of the credit union's affairs.

8

(2) Timing of repudiation

The conservator or liquidating agent appointed
for any insured credit union shall determine
whether or not to exercise the rights of
repudiation under this subsection within a
reasonable period following such appointment.

12 U.S.C. § 1787(c) (emphasis added).

In a letter dated October 17, 2013, an official
representative of the NCUA advised Goldman Sachs, in response to
its October 8 request to arbitrate the dispute, that NCUA was
repudiating the contract:

After consideration of these circumstances [the
liquidation of Southwest] as well as the terms and
conditions of this contract, I have determined that
continuation of such a contract would be burdensome
and would hinder the orderly administration of the
affairs of "Southwest."  Accordingly, this letter
serves as notice that the "Cash Amount Agreement," and
any amendments thereto, to the extent it is determined
to be valid and in effect, is hereby repudiated,
effective October 31, 2010.

The remainder of the letter states that, while § 1787(c) permits
parties whose contracts have been repudiated to seek actual
direct compensatory damages, NCUA does not believe Goldman Sachs
has suffered any such damages.  Should Goldman Sachs feel
otherwise, it could notify NCUA accordingly.

The repudiation authority language in 12 U.S.C. § 1787(c)
is materially identical to the language in 12 U.S.C. § 1821(e),
which provides repudiation authority for the Federal Deposit

Insurance Corporation ("FDIC") and the Resolution Trust

Corporation ("RTC").  Section 1821(e) reads as follows:

> (e) Provisions relating to contracts entered into
> before appointment of conservator or receiver
>
> > (1) Authority to repudiate contracts
> >
> > In addition to any other rights a conservator or
> > receiver may have, the conservator or receiver
> > for any insured depository institution may
> > disaffirm or repudiate any contract or lease—
> >
> > > (A) to which such institution is a party;
> > >
> > > (B) the performance of which the conservator
> > > or receiver, in the conservator's or
> > > receiver's discretion, determines to be
> > > burdensome; and
> > >
> > > (C) the disaffirmance or repudiation of
> > > which the conservator or receiver
> > > determines, in the conservator's or
> > > receiver's discretion, will promote the
> > > orderly administration of the institution's
> > > affairs.
> >
> > (2) Timing of repudiation
> >
> > The conservator or receiver appointed for any
> > insured depository institution in accordance with
> > subsection (c) of this section shall determine
> > whether or not to exercise the rights of
> > repudiation under this subsection within a
> > reasonable period following such appointment.

12 U.S.C. § 1821(e).

The Second Circuit has previously analyzed the repudiation

authority of the FDIC and RTC under 12 U.S.C. § 1821(e), and its

decisions are dispositive of the present motion.  It has

concluded that § 1821(e) "expressly grants the [agency] the

power to abrogate valid contracts and leases where the agency
has determined that they are burdensome." Resolution Trust
Corp. ("RTC") v. Diamond, 45 F.3d 665, 670 (2d Cir. 1995)
("Diamond II").  The Court of Appeals has also observed that the
provision is broadly worded, applying to "'any contract or
lease.'" Westport Bank & Trust Co. v. Geraghty, 90 F.3d 661,
668 (2d Cir. 1996) (quoting 12 U.S.C. § 1821(e) and holding that
the provision applied to employment contracts).

Summarizing the legislative history of the provision, the
Second Circuit stated that "the entire purpose underlying [the
agency's] repudiation power is the maximization of return on
assets." Diamond II, 45 F.3d at 675; see also RTC v. Diamond,
18 F.3d 111, 113 (2d Cir. 1994) ("Diamond I"), granted, vacated,
and remanded by Solomon v. Resolution Trust Corp., 513 U.S. 801
(1994), for reconsideration in light of O'Melveny & Myers v.
FDIC, 512 U.S. 79 (1994), reinstated in relevant part by Diamond
II, 45 F.3d at 668.  Thus, Congress "conferred on" the agency
the "power to repudiate leases it deems burdensome." Diamond
II, 45 F.3d at 675; see also Diamond I, 18 F.3d at 124.
Moreover, "whether the [contract or] lease is burdensome is to
be decided at the discretion of the conservator or receiver."
1185 Ave. of Americas Associates v. RTC, 22 F.3d 494, 498 (2d
Cir. 1994) (citing 12 U.S.C. § 1821(e)).  "[T]here is no

11

requirement that the conservator or receiver make a formal finding that a lease or contract is burdensome."  Id.

With regard to the timing of repudiation, "[t]he amount of time that is reasonable must be determined according to the circumstances of each case."  RTC v. CedarMinn Bldg. Ltd. P'ship, 956 F.2d 1446, 1455 (8th Cir. 1992), cited with approval in Diamond I, 18 F.3d at 117-18.  "Congress specifically intended to give [the agency] flexibility in determining what constitutes a reasonable period for repudiation."  CedarMinn Bldg. Ltd. P'ship, 956 F.2d at 1455; see also id. at n.13 (noting that a strict 90-day repudiation period in earlier drafts of the relevant legislation had been eliminated).

Given the materially identical language in 12 U.S.C. § 1821(e) and 12 U.S.C. § 1787(c), the same reading of § 1821(e) applies to § 1787(c).  See United States v. Robinson, 702 F.3d 22, 33-34 (2d Cir. 2012) (stating that where Congress has used materially identical language, it "obviously" intended the same purpose).  Thus, under 12 U.S.C. § 1787(c), NCUA is empowered to repudiate "any contract or lease," so long as four conditions are met: (1) the credit union was a party to the contract; (2) NCUA determines, in its discretion, that the contract is burdensome; (3) NCUA determines, in its discretion, that repudiation would promote the orderly administration of the

12

credit union's affairs; and (4) NCUA repudiates within a "reasonable period" from when it was appointed conservator or liquidator, as determined by the circumstances of the case.

All four conditions are met here, permitting NCUA to repudiate the Cash Account Agreement that Southwest entered into with Goldman Sachs in 1992.  It is undisputed that Southwest was a party to the Cash Account Agreement.  The October 17, 2013 letter establishes that NCUA has determined, in its discretion, that the Cash Account Agreement is burdensome and that its repudiation would promote the orderly administration of Southwest's affairs.

The fourth condition merits slightly more discussion.  The repudiation did not occur until October 17, 2013, almost three years after NCUA's appointment as conservator on September 24, 2010.  NCUA asserts, however, that it was unaware of the existence of the Cash Account Agreement contract -- despite having conducted a diligent search for such contracts -- until October 8, 2013, which is when Goldman informed NCUA of the existence of the contract by seeking to enforce the mandatory arbitration clause.

In a declaration accompanying its opposition, NCUA describes its efforts to locate Southwest's third-party contracts when it became conservator and then liquidating agent

for Southwest.  In or about October 2010, Southwest's legal
counsel provided the division within NCUA that is responsible
for managing and preserving records of a seized credit union
with a 1,900 entry spreadsheet purportedly listing all of
Southwest's contracts with third parties.  Nine entries
pertained to Goldman Sachs, which consisted of five contracts.
The 1992 Cash Account Agreement contract was not listed on the
spreadsheet.  The declarant states that, to the best of her
knowledge, NCUA was unaware of the contract until Goldman Sachs
produced it during this litigation.

NCUA repudiated the contract within nine days of when it
became aware of the contract.  In such circumstances, NCUA's
repudiation occurred within a "reasonable period" from when it
was appointed conservator.  Accordingly, having met all four
conditions for repudiation of a contract under 12 U.S.C. §
1787(c), NCUA is not bound by the 1992 Cash Account Agreement
and the mandatory arbitration clause contained therein, on which
Goldman Sachs relies in seeking to compel arbitration.

Goldman Sachs makes essentially four arguments in response,
none of which is persuasive.  First, Goldman Sachs objects that
NCUA's assertions in October 17, 2013 letter are conclusory,
formulaic, and lacking because NCUA does not explain how or why
the contract is burdensome.  Goldman Sachs's objection, however,

14

is foreclosed by 1185 Ave. of Americas Assocs., 22 F.3d at 498, which held that no such scrutiny is demanded of the FDIC's or RTC's determination that a contract is burdensome under 12 U.S.C. § 1821(e).  That holding applies equally to the NCUA's determination that this contract is burdensome under 12 U.S.C. § 1787(c).

Goldman Sachs attempts to distinguish 1185 Ave. of Americas Assocs. on the grounds that the burden was obvious in that case and that the case did not involve a purely procedural provision. This is an overly narrow reading of 1185 Ave. of Americas Assocs.  The Second Circuit gave three reasons for reaching its holding, only the second of which was based on the burden in that case.  The remaining two reasons -- which were variations of the observation that the statutory text evinced Congress's intent to vest the decision whether such contracts are burdensome with the agency, not the courts -- apply equally when a contract is deemed burdensome due to the existence of an arbitration clause.  See 1185 Ave. of Americas Assocs., 22 F.3d at 498.  Thus, as NCUA has exercised its statutory discretion to deem the contract between Southwest and Goldman Sachs burdensome, this Court will not second-guess that determination.

Second, Goldman Sachs objects that NCUA did not repudiate the contract "within a reasonable period" following its

appointment.  Goldman Sachs contends that determining the
"reasonable period" from the time when NCUA became aware of the
contract contradicts the plain terms of the statute, which
states that the "reasonable period" is determined from the date
of the conservator's appointment.

It is the "period" of time, however, that is triggered by
the date of the appointment.  What is "reasonable" turns on the
circumstances.  See CedarMinn Bldg. Ltd. P'ship, 956 F.2d at
1455.  Of course, NCUA cannot be expected to repudiate a
contract of which it was unaware.  Accordingly, under these
circumstances, the repudiation occurred within a "reasonable
period."

Third, Goldman Sachs disputes the diligence of NCUA's
search, calling it a "patently inadequate" review.  This
characterization is not sufficient to prevent NCUA from relying
on § 1787(c).  When NCUA became the liquidating agent for
Southwest, it requested information on Southwest's third-party
contracts.  It received and reviewed a 1,900 entry spreadsheet
provided by Southwest, which did not contain the one-page, 18-
year old Cash Account Agreement contract.  While Goldman Sachs
points to certain discrepancies that could have led NCUA to
continue searching for other third-party contracts, NCUA was
justified in stopping its search.  Based on these facts, NCUA's

16

review was reasonable and adequate.

Fourth, Goldman Sachs argues that NCUA's repudiation power does not extend to purely procedural provisions such as agreements to arbitrate.  Goldman Sachs makes no attempt to support this argument by the plain text of the statute, which is broad and applies to "any contract."  See Geraghty, 90 F.3d at 668.  Rather, Goldman Sachs insists that this principle is supported by a footnote from a 1976 decision that addressed the authority of the bankruptcy court to disavow an agreement to arbitrate.  Truck Drivers Local Union No. 807 v. Bohack Corp., 541 F.2d 312, 319 (2d Cir. 1976).  The Court of Appeals observed in that decision that the debtor "may not abrogate a contractual obligation save by statutory or judicial permission."  Id. (emphasis supplied).  In Truck Drivers, the court held that the party seeking to arbitrate was required to receive "judicial" authorization from the bankruptcy court, which had the power to reject the duty to arbitrate contained in a collective bargaining agreement.  Id. at 320.  Here, of course, there is "statutory" authority to support the repudiation by the NCUA.

Goldman Sachs emphasizes language in a footnote of the decision, which reads: "[L]ike any other unilateral breach of contract, [rejection of a contract by a bankruptcy court] does not destroy the contract so as to absolve the parties

17

(particularly the breaching party) from a contractual duty to arbitrate their disputes." Id. at 321 n.15.  So, Goldman Sachs argues, NCUA's repudiation does not absolve its obligation to arbitrate.  Read in context, however, this footnote does not alter the thrust of the decision, which recognizes that a court or a party, when authorized by a statute, may reject a contractual duty to arbitrate.  Moreover, in making its observation in the footnote, Truck Drivers relied on Drake Bakeries, Inc. v. Local 50, Am. Bakery & Confectionery Workers Int'l, AFL-CIO, 370 U.S. 254 (1962).  In Drake Bakeries, the Supreme Court stated that "[a]rbitration provisions, which themselves have not been repudiated, are meant to survive breaches of contract, in many contexts, even total breach."  Id. at 262 (emphasis added).  The Supreme Court added, "in determining whether one party has so repudiated his promise to arbitrate that the other party is excused the circumstances of the claimed repudiation are critically important."  Id. at 262-63.  In this case, the October 17, 2013 letter of repudiation extends to the arbitration provision in the contract.  In sum, NCUA has carried its burden to show that it properly repudiated the arbitration clause in the 1992 Cash Account Agreement pursuant to 12 U.S.C. § 1787(c).

18

II. Remaining Arguments Supporting Unenforceability

     NCUA also invokes sub-sections 1787(b)(9) and 1788(a)(3) to prevent Goldman Sachs from enforcing the contract against it.[5] These sections require, <u>inter alia</u>, that the contract be "an official record" of the credit union to be "valid" against the Board.  As a non-statutory basis for the same argument, NCUA invokes the common law doctrine of <u>D'Oench, Duhme & Co. v. FDIC</u>, 315 U.S. 447 (1942).  NCUA asserts that, because it did not find the contract between Southwest and Goldman Sachs when it

_____

[5] Subsection 1787(b)(9), as relevant here states that "any agreement which does not meet the requirements set forth in section 1788(a)(3) of this title shall not form the basis of, or substantially comprise, a claim against the liquidating agent or the Board."  Subsection 1788(a)(3), in turn, reads:

> (3) <u>No agreement which tends to diminish or defeat the right</u>, title, or interest <u>of the Board</u>, in any asset acquired by it under this subsection, either as security for a loan or by purchase, <u>shall be valid against the Board unless such agreement</u>--
>      (A) shall be in writing;
>      (B) shall have been executed by the credit union and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the credit union;
>      (C) shall have been approved by the board of directors of the credit union, which approval shall be reflected in the minutes of such board; and
>      (D) <u>shall have been continuously</u>, from the time of its execution, <u>an official record of the credit union</u>.

12 U.S.C. § 1788(a)(3) (emphasis added).

conducted a reasonable review of the credit union's books and records, the contract is not an "official record" and thus invalid against it.

NCUA also invokes 12 U.S.C. § 1787(g).  The subsection, titled "Limitation on court action," provides that "no court may take any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of powers or functions of the Board as a conservator or a liquidating agent."  12 U.S.C. § 1787(g) (emphasis added).  NCUA asserts that compelling arbitration would "restrain or affect" its function as liquidating agent and therefore the contract is not enforceable under § 1787(g).

Finally, NCUA contends that there are genuine issues of factual dispute as to the validity, enforceability, and applicability of the contract.  NCUA contends that, because discovery is necessary to resolve these disputes, the motion to compel arbitration must be denied at this pre-discovery stage.

The Court need not address these alternative arguments because NCUA prevails on its first argument.  NCUA has properly repudiated, under 12 U.S.C. § 1787(c), the 1992 Cash Account Agreement between Southwest and Goldman Sachs.  Because that contract includes the arbitration provision on which Goldman Sachs relies in moving to compel arbitration, the motion to

compel arbitration is denied.


CONCLUSION

The defendants' November 13, 2013 motion to compel

arbitration is denied.


SO ORDERED:

Dated:    New York, New York
          January 28, 2014


_____
              DENISE COTE
        United States District Judge